NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

|  |  |
|---|---|
| TYRIN MALIK GILLIS,<br><br>Appellant,<br><br>v.<br><br>STATE OF ALASKA,<br><br>Appellee. | Court of Appeals No. A-13567<br>Trial Court No. 4FA-19-02379 CR<br><br>O P I N I O N<br><br>No. 2767 — December 8, 2023 |

Appeal from the District Court, Fourth Judicial District, Fairbanks, Matthew C. Christian, Judge.

Appearances: Jay A. Hochberg, Attorney at Law, under contract with the Public Defender Agency, and Samantha Cherot, Public Defender, Anchorage, for the Appellant. Renner J. St. John, Assistant District Attorney, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Terrell, Judges.

Judge ALLARD.

A jury convicted Tyrin Malik Gillis of fifth-degree weapons misconduct for failing to immediately inform a peace officer that he possessed a concealed firearm on his person when he assisted his friends in removing possessions from a car that was

being impounded.[1] At sentencing, Gillis received a conviction of record but no jail or probation time. He now appeals his conviction and his sentence.

Gillis's challenge to his sentence was resolved through an earlier remand. At sentencing, Gillis (who had no prior convictions) requested a suspended imposition of sentence. A defendant who receives a suspended imposition of sentence is entitled to have their conviction set aside if they successfully complete a specified term of probation.[2] The prosecutor and the district court agreed that a suspended imposition of sentence would be appropriate in this case, but they both believed that Gillis was ineligible for one because AS 12.55.085(f) prohibits the court from suspending the imposition of a sentence of a person who "uses a firearm in the commission of the offense for which the person is convicted."[3]

On appeal, however, the State conceded that AS 12.55.085(f) does not apply to Gillis because Gillis "possessed" a firearm but did not "use" it in the commission of the offense. Because this concession was well-founded,[4] we issued an unpublished order temporarily returning jurisdiction to the district court so that a resentencing could occur.

On remand, the district court imposed a 1-day of probation suspended imposition of sentence, and then set aside Gillis's conviction. We now memorialize our holding that the statutory prohibition against suspended impositions of sentence under

---

[1]   AS 11.61.220.

[2]   AS 12.55.085(d)-(e).

[3]   AS 12.55.085(f) (exempting persons convicted of certain criminal offenses from receiving a suspended imposition of sentence).

[4]   *See Marks v. State*, 496 P.2d 66, 67-68 (Alaska 1972) (explaining that appellate courts must independently assess whether a concession of error by the State in a criminal case is supported by the record on appeal and has legal foundation).

AS 12.55.085(f) applies only to persons who actively *use* a firearm in the commission of the offense; it does not apply to persons who merely possess a firearm.

Although Gillis's conviction has been set aside, we must still address his challenge to the conviction and determine whether the original conviction was lawful.

A person commits the offense of fifth-degree weapons misconduct under AS 11.61.220(a)(1)(A)(i) if the person

> (1) is 21 years of age or older and knowingly possesses a deadly weapon, other than an ordinary pocket knife or a defensive weapon,
>
>> (A) that is concealed on the person, and, when contacted by a peace officer, the person fails to
>>
>>> (i) immediately inform the peace officer of that possession[.]

"[C]ontacted by a peace officer" is defined statutorily as "stopped, detained, questioned, or addressed in person by the peace officer for an official purpose."[5]

On appeal, Gillis argues that the evidence used to convict him at trial was legally insufficient because, according to Gillis, "contacted by a peace officer" is limited to situations in which a person has been seized under the Fourth Amendment. After reviewing the legislative history, we conclude that the term "contacted by a peace officer" was intended to apply to Fourth Amendment seizures and to interactions with the police that are akin to a seizure in terms of formality and purpose. We further conclude that Gillis was not "stopped, detained, questioned, or addressed in person by [a] peace officer for an official purpose" within the intended meaning of those terms. We therefore reverse Gillis's original conviction for fifth-degree weapons misconduct.

---

[5] AS 11.61.220(i).

*Relevant facts and prior proceedings*

In the early morning hours of Saturday, August 17, 2019, Fairbanks Police Officer Jason Pace was on patrol when he encountered a vehicle that was driving on four flat tires. Officer Pace initiated a traffic stop, which evolved into an investigation for driving under the influence based on his contact with the driver. Because the driver was initially uncooperative, Officer Pace asked for back-up, and eventually several officers responded, including Officer Lane Bonham and Sergeant Nathan Werner.

While Officer Bonham was arresting the driver, a white vehicle drove up near the investigation scene and dropped Gillis off. Officer Pace and Sergeant Werner considered it unusual that a person would be dropped off at the scene of a driving under the influence investigation, so they approached Gillis, with Sergeant Werner asking him, "What's up, man?" Gillis asked if he could drive the stopped vehicle away from the scene, and Sergeant Werner said that he could not because it had four flat tires and was going to be impounded.

Gillis stated that the driver and passengers in the stopped vehicle were his friends. Sergeant Werner explained that the driver had been arrested for driving under the influence, and that the vehicle could be recovered from impound. The officer indicated that the passengers were taking off to a nearby gas station. Gillis asked if he could just talk to the driver and tell him to "chill out." Sergeant Werner indicated that that was unnecessary because the driver had been "pretty cool."

Gillis then walked around the front of the car to see his friends. After receiving permission to assist his friends in removing their possessions from the car, Gillis leaned into the vehicle to get an object in the front seat. As Gillis was leaning into the vehicle, Sergeant Werner noticed what appeared to be a pistol in Gillis's right front pocket. Sergeant Werner alerted Officer Pace that Gillis had a gun. Officer Pace shined his flashlight on Gillis's pocket and verified this. Officer Pace then grabbed Gillis's arm and reached into his pocket and retrieved the firearm. Officer Pace asked Gillis, "What's with the firearm in your pocket?" Gillis responded, "That's mine, that's mine."

When the police checked Gillis's name in the Alaska Public Safety Information Network (APSIN), they discovered that he had been advised by a military police officer four months earlier about his duty to "immediately inform" law enforcement of any concealed handgun on his person "when contacted by a peace officer."

Based on the foregoing, Gillis was arrested and charged by complaint with one count of fifth-degree weapons misconduct in violation of AS 11.61.220(a)(1)(A)(i), which makes it a class B misdemeanor for a person who is twenty-one years of age or older to "knowingly possesses a deadly weapon . . . that is concealed on the person, and, when contacted by a peace officer, the person fails to immediately inform the peace officer of that possession." "[C]ontacted by a peace officer" is defined statutorily as "stopped, detained, questioned, or addressed in person by the peace officer for an official purpose."[6]

At trial, Fort Wainwright Police Officer Jenny Kaiser testified that, four months earlier, Gillis had come to the visitor center near the post's main gate to report that a friend was being harassed. While taking the report, Officer Kaiser asked Gillis if he had a weapon on him. Gillis stated that he did not, but that he had one in his vehicle. Officer Kaiser testified that she informed Gillis about Alaska's law on carrying a concealed weapon:

> *Officer Kaiser*: I said that if he has a weapon on him . . . that he needs to talk to — or tell the officer that it's there, not to reach for it. And if the officer's in the process of talking to him, while he knows that, just go ahead and interrupt the officer and just tell them where it is.

Gillis's defense at trial was two-fold. First, he argued that the handgun was not "concealed" because it was in his front pocket and readily identifiable as a firearm by both police officers. Second, he argued that his interaction with the police

---

[6] AS 11.61.220(i).

did not qualify as being "stopped, detained, questioned, or addressed in person by [a] peace officer for an official purpose" because Gillis was not the subject of the investigation or even a participant in or witness to the investigation.

In her opening statement, Gillis's defense attorney analogized his situation to one where a person with a concealed weapon is trying to find a restaurant. While walking, the person comes across some police officers and asks for directions to the restaurant. During the interaction, the person bends over to pick something up, and only then does the officer notice the concealed weapon.

At the close of the State's evidence, Gillis moved for a judgment of acquittal, arguing that the firearm was not concealed and that the situation where he was helping the passengers remove their effects did not meet the statutory definition of "contacted by a peace officer" because he was not "stopped or detained," was not "questioned," and was not "asked for any ID" or even his name.

The trial judge concluded that the officers' initial interaction with Gillis did not meet the statutory criteria for being "contacted by a peace officer" because it was too casual and involved only chit-chat between Gillis and the officers. The judge therefore granted a judgment of acquittal as to the initial interaction with the officers and prohibited the prosecutor from arguing that this conduct constituted being "contacted by a peace officer."

However, the judge concluded that a jury could reasonably find that Gillis had been "addressed in person by the peace officer for an official purpose" at the point in his interaction when Gillis obtained permission to help his friends remove their personal effects from the vehicle. The judge also concluded that there was sufficient evidence of concealment to permit the issue to go to the jury.

The jury subsequently convicted Gillis. This appeal followed.

*Why we reverse Gillis's conviction for fifth-degree weapons misconduct*

On appeal, Gillis argues that the evidence presented at trial was insufficient to convict him of fifth-degree weapons misconduct. Although framed as a sufficiency issue, Gillis's challenge to his conviction ultimately rests on a question of statutory interpretation: what does "contacted by a peace officer" mean? That is, when is a person considered "stopped, detained, questioned, or addressed in person by the peace officer for an official purpose" for purposes of triggering a person's legal duty under AS 11.61.220(a)(1)(A)(i) to "immediately inform" the peace officer of a concealed deadly weapon on their person?

The proper interpretation of a statute is a question of law to which we apply our independent judgment.[7] "When 'interpreting a statute, we consider its language, its purpose, and its legislative history, in an attempt to give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others.'"[8] "We do not mechanically apply the plain meaning rule, using instead a sliding scale approach to statutory interpretation, in which the plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be."[9]

Thus, before analyzing the meaning of the specific language at issue, we first review the legislative history of AS 11.61.220(a)(1). As we are about to explain, AS 11.61.220(a)(1)'s affirmative disclosure requirement for concealed carry weapons, as originally enacted, only applied to individuals who had received permits to possess concealed firearms. Those individuals had been specifically informed of their obligation to affirmatively disclose their possession of a concealed firearm to police officers as part of the permitting process. But the legislature ultimately removed the

---

[7]   *Kohlhaas v. State*, 518 P.3d 1095, 1103-04 (Alaska 2022).

[8]   *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019) (internal quotations omitted).

[9]   *State v. Fyfe*, 370 P.3d 1092, 1095 (Alaska 2016) (internal quotations omitted).

requirement that a permit be obtained before carrying a concealed firearm and, at the same time, extended the affirmative disclosure requirement to essentially all individuals in possession of a concealed weapon who are "contacted by a peace officer," as the legislature intended that term to be understood.

### The history of AS 11.61.220(a)(1)

Prior to 1994, Alaska law prohibited all persons who were not peace officers from carrying a concealed deadly weapon unless the person was (1) on their own property; or (2) engaged in lawful outdoor activity, such as hunting.[10]

In 1994, the Alaska legislature created a concealed carry permit system that allowed non-law enforcement individuals to carry a concealed firearm if they completed a rigorous permitting process.[11] The permitting process required various background checks and mandatory gun safety trainings.[12]

As part of the new concealed carry permit system, the legislature enacted a provision that required a permittee, if stopped by a peace officer, to "immediately inform" the peace officer that they were carrying a concealed handgun "under the

---

[10] Former AS 11.61.220(a)(1) (1991) (prohibiting people from knowingly possessing a deadly weapon other than a pocket knife or defensive weapon concealed on the person); former AS 11.61.220(c) (1991) (exempting peace officers from the restrictions under (a)(1)); former AS 11.61.220(b) (1980) (providing for affirmative defenses including that the person was on their own land or "engaged in lawful hunting, fishing, trapping, or other lawful outdoor activity that necessarily involves the carrying of a weapon for personal protection"); *see also* Commentary to Alaska's Revised Criminal Code, 1978 Senate Journal Supp. No. 47 (June 12), at 103 (explaining that the affirmative defense of being on one's own land "recognizes that the privacy right of Alaska's citizens to carry concealed weapons in their dwelling or on property appurtenant to their dwelling outweighs law enforcement's interest in regulating such activity").

[11] *See* SLA 1994, ch. 67, § 4.

[12] *See id.*

permit."[13] Initially, the bill used the word "stopped" rather than "contacted."[14] But the bill was later amended to use the term "contacted by a peace officer" which was defined as "stopped, detained, questioned, or addressed in person by the peace officer for an official purpose."[15]

This definition appears to have received little discussion in the official committee hearings. The only substantive discussion of the provision appears to be from the bill sponsor, Representative Jeannette James, who described two examples of circumstances in which permittees would be expected to inform law enforcement of any concealed handguns. The first example involved a traffic stop or similar type of seizure — "if you were speeding down a highway or for any other reason a policeman stopped you."[16] The second example involved a situation where the person found themselves as a witness or participant in the middle of an active police investigation even though they were not the target of the investigation:

> There are other times when you might be just in the crowd of something that happened and there was a skirmish of some sort, you're totally an innocent person, you have the obligation to let that policeman know that you have a permit for concealed carry.[17]

---

[13]  *Id.*

[14]  *See* C.S.H.B. 351, 18th Leg., 1st Sess. (Version B) (as offered by H. Stan., Mar. 2, 1994) (stating that "[w]henever a permittee who is carrying a concealed weapon is stopped by a peace officer, the permittee shall immediately inform the peace officer that the permittee is carrying a concealed weapon under the permit").

[15]  *See* C.S.H.B. 351, 18th Leg., 1st Sess. (Version C) (as offered by H. Jud., Mar. 25, 1994).

[16]  Audio of Senate Finance Committee, House Bill 351, statement of Representative Jeannette James, Tape SFC-94, #78, at 1:13:34 - 1:13:40 (Apr. 29, 1994).

[17]  *Id.* at 1:13:48 - 1:14:01.

Notably, the duty to "immediately inform" police about a concealed handgun applied only to concealed carry permittees who were educated about this duty as part of the permitting process.[18]

This system changed in 2003, when the legislature enacted legislation that retained a voluntary permit system but legalized the permitless carrying of concealed deadly weapons for essentially everyone over the age of twenty-one who was not otherwise prohibited by law from carrying such weapons.[19] In creating this new permitless system, the legislature extended the duty to "immediately inform" police officers about concealed deadly weapons to anyone who carried a concealed weapon on their person, including persons on their own property or engaged in hunting or other outdoor activities.[20] The legislature accomplished this by repealing AS 18.65.750, the

---

[18] Former AS 18.65.750(b) (1994) ("Whenever a permittee who is carrying a concealed handgun is contacted by a peace officer, the permittee shall immediately inform the peace officer that the permittee is carrying a concealed handgun under the permit."); former AS 18.65.715(a)(1) (1994) (requiring that applicants take an approved handgun course, which included "knowledge of Alaska law relating to firearms and the use of deadly force"); *see also* SLA 1994, ch. 67, § 4.

[19] SLA 2003, ch. 62, §§ 1-7. *See* Sponsor Statement from Representative Eric Croft, regarding House Bill 102 (Apr. 10, 2003) ("HB 102 does not eliminate the state's concealed carry permit program for two reasons. First, a person may want a permit to allow reciprocity, i.e. traveling to a reciprocity state for a hunt. Second, a concealed carry permit is useful for purchasing because it allows permit holders to bypass the required waiting period because the FBI background checks have already been completed during the permitting process.").

*See also* Letter from Brian Judy, Alaska State Liaison of the National Rifle Association, to Representative Eric Croft, regarding House Bill 102 (Apr. 4, 2003) ("Law-abiding citizens should not be required to obtain permission to provide a means of self protection for themselves or their family. Indeed, Article I, Section 19 of the Alaska State Constitution provides that 'The *individual* right to keep and *bear* arms shall not be denied or infringed by the state…' Alaska's prohibition on concealed carry essentially puts a pricetag on those Alaskan's natural right to self-defense for whom carrying a firearm in plain view is not a reasonable nor responsible option.").

[20] SLA 2003, ch. 62, §§ 1-2; Audio of Senate Judiciary Committee, House Bill 102, statement of Mark Enoft, staff member to Representative Eric Croft, Tape 03-44, at 2:33 -

prior concealed carry permitting statute, and placing its language about "immediately inform[ing]" a peace officer when "contacted" in AS 11.61.220, the statute defining the class B misdemeanor offense of fifth-degree weapons misconduct. Alaska Statute 11.61.220(a)(1) was therefore amended to its current form, which provides:

> (a)     A person commits the crime of misconduct involving weapons in the fifth degree if the person
>
> > (1)     is 21 years of age or older and knowingly possesses a deadly weapon, other than an ordinary pocket knife or a defensive weapon,
> >
> > > (A)     that is concealed on the person, and, when contacted by a peace officer, the person fails to
> > >
> > > > (i)     immediately inform the peace officer of that possession; or
> > > >
> > > > (ii)     allow the peace officer to secure the deadly weapon, or fails to secure the weapon at the direction of the peace officer, during the duration of the contact[.][21]

The legislature also inserted the definition of "contacted by a peace officer" in the fifth-degree weapons misconduct statute. Alaska Statute 11.61.220(i) now states: "In (a)(1)

---

3:33 (May 12, 2003) (saying that HB 102 will expand the reporting requirement to hunters and individuals who are on private property); Sponsor Summary from Representative Eric Croft, regarding House Bill 102 (2003), at 8 ("Section 1(a)(1)(A) requires anyone carrying a concealed deadly weapon to inform a peace officer that they are carrying a concealed weapon when contacted by an officer, to secure the weapon when directed by the officer, and to allow the officer to secure the weapon if requested to do so by the officer. Under the changes brought by this bill, these requirements apply even if the person is on their own property when contacted by the officer. This is not currently required in statute.").

   [21]   AS 11.61.220(a)(1)(A)(i)-(ii); *see also* SLA 2003, ch. 62, § 1.

of this section, 'contacted by a peace officer' means stopped, detained, questioned, or addressed in person by the peace officer for an official purpose."[22]

However, the addition of this statutory language and the creation of a new criminal offense was not without controversy. At the second meeting of the House State Affairs Committee, Representative Eric Croft, the bill's sponsor, explained that the intent of these changes to AS 11.61.220 was to extend the "affirmative obligation" to inform police of concealed weapons beyond concealed carry permittees to anyone carrying a concealed weapon.[23]

Later in the hearing, Representative Ethan Berkowitz raised due process and notice concerns regarding the obligation to "immediately inform" police officers of any concealed weapon. He suggested that when the police make contact with a person, the officer should affirmatively tell the person of their obligation to inform the officer about any concealed weapons, likening this advisement to *Miranda* warnings.[24] Representative Berkowitz also asked what the culpable mental state would be if the person failed to immediately inform the police of a concealed weapon,[25] and expressed

---

[22] SLA 2003, ch. 62 § 4. *Compare id. with* former AS 18.65.750(d) (1994) ("In this section, 'contacted by a peace officer' means stopped, detained, questioned, or addressed in person by the peace officer for an official purpose.").

[23] Audio of House State Affairs Standing Committee, House Bill 102, statement of Representative Eric Croft, Tape 03-38, at 10:28 - 11:20 (Apr. 8, 2003) ("[The 1994 law] also said that if you were a permittee and an officer stopped you, you were under an affirmative obligation to tell them that you had the weapon. And, if they felt it necessary, allow them to secure it while you're talking. . . . You say 'Hi, officer, I have my .45 with me' [and the officer could then seize the weapon if they want]. . . . But the way it was written, that was a requirement of permittees and if you were on your own land or hunting or fishing, you escaped that requirement. . . . We have made that a general requirement.").

[24] Audio of House State Affairs Standing Committee, House Bill 102, statement of Representative Ethan Berkowitz, Tape 03-38, at 24:08 - 24:32 (Apr. 8, 2003).

[25] *Id.* at 25:13 - 25:45 ("What's the *mens rea*, if you don't immediately inform? What's the culpable mental state? . . . There's no intent to not inform the officer, it's not reckless because you don't know about it, you're not negligent because you don't know about it . . .

concern about "imposing an affirmative duty on people to inform the police of anything."[26] As he explained, "If people are unaware of that affirmative duty, it seems to me problematic to try and prosecute them for a violation of that section."[27]

In response to Representative Berkowitz's due process and notice concerns, Representative Max Gruenberg suggested that a person should only be subject to prosecution if they failed to immediately inform the police officer about a concealed weapon when "asked if they had a weapon."[28] However, the sponsor of the bill, Representative Croft, expressed reluctance to put the burden of asking about a weapon on the police.[29] The committee then heard public testimony in response to the bill, without resolving the due process or notice issues raised by Representative Berkowitz.[30] At the end of the discussion, Chairman Bruce Weyhrauch requested that Representative Croft work with the committee on addressing the questions raised during the hearing.

---

so it almost seems that you've devolved into a situation where . . . there's no mental state required at all. And that runs counter to most components of the criminal code.").

[26] *Id.* at 28:22 - 28:30.

[27] *Id.* at 28:33 - 28:44.

[28] Audio of House State Affairs Standing Committee, House Bill 102, statement of Representative Max Gruenberg, Tape 03-38, at 29:03 - 29:16 (Apr. 8, 2003).

[29] Audio of House State Affairs Standing Committee, House Bill 102, statement of Representative Eric Croft, Tape 03-38, at 29:17 - 29:30 (Apr. 8, 2003).

[30] During the public testimony, Lauree Hugonin, the Executive Director of the Alaska Network on Domestic Violence and Sexual Assault, who testified against the bill, echoed Representative Berkowitz's concerns about notice, noting that under the permit system, permittees were given "a packet of information" so that they knew what the statutes and regulations were and were therefore aware of their affirmative obligation to inform police about any concealed firearm. Audio of House State Affairs Standing Committee, House Bill 102, testimony of Lauree Hugonin, Executive Director, Alaska Network on Domestic Violence & Sexual Assault, Tape 03-38, at 33:50 - 34:36 (Apr. 8, 2003).

At the next House State Affairs Committee meeting, held two days later, Representative Croft began his remarks by noting that there had been some issues with the definition of "contacted by a[] [peace] officer," and that he had distributed a memorandum from Legislative Counsel Gerald Luckhaupt, the attorney who drafted the legislation, addressing the origin and meaning of that phrase.[31] The Luckhaupt memo indicated that the statutory language had been taken from AS 18.65.750 (the former concealed carry permitting statute) and that it had been "designed to reach situations when a concealed handgun permittee is contacted by a peace officer and the peace officer is entitled to do a protective frisk of the person under the authority of *Terry v. Ohio*, 392 U.S. 1 (1968)."[32] The memo indicated that the language had been developed in 1994 "after much discussion" and the attorney was unaware of any problems in the application of the statute.[33]

After distributing the Luckhaupt memo, Representative Croft indicated that he did not intend to alter the definition of "contacted by a[] [peace] officer" since

---

[31] Audio of House State Affairs Committee, House Bill 102, statement of Representative Eric Croft, Tape 03-39, at 53:50 - 53:59 (Apr. 10, 2003).

[32] Memorandum from Gerald P. Luckhaupt, Legislative Counsel, to Representative Eric Croft, regarding House Bill 102 (Apr. 9, 2003). The memo states:

> You have asked about the origin of the term 'contacted by a peace officer' which is used in sec. 1 of CSHB 102() and defined in sec. 4 of that bill. This term exists in the Alaska statutes in AS 18.65.750. It currently governs the conduct of concealed handgun permittees when those permittees are 'contacted by a peace officer.' This language was developed after much discussion in 1994 when the concealed handgun permit system was first adopted. I have not been informed of any problems in the application of this statute in the concealed handgun permit system. It was designed to reach situations when a concealed handgun permittee is contacted by a peace officer and the peace officer is entitled to do a protective frisk of the person under the authority of *Terry v. Ohio*, 392 U.S. 1 (1968).

[33] *Id.*

that statutory language had "worked well" in the old permit system.[34] The bill then moved out of committee without any further amendments or discussion on this definition.

Subsequently, the House Judiciary Committee held two hearings on the bill. The bill file for those hearings included the same Luckhaupt memo. The memo was identified in the bill file's table of contents as "Legal Opinion: Definition of 'contacted by a peace officer.'"[35] There were no substantive discussions of the meaning of "contacted by a peace officer" in the hearings. Instead, the discussion focused on whether it was good public policy to eliminate the mandatory training that the concealed carry permitting system had.

The final two committee hearings were before the Senate Judiciary Committee. The Luckhaupt memo was again included as part of the packet of information the committee members received about the bill, and was again identified as "Legal Opinion: Definition of 'contacted by a peace officer.'"[36] At the first Senate Judiciary Committee hearing, a staff member to Representative Croft explained that the bill "eliminates some of the confusion" about when a person must tell a peace officer about a concealed weapon because that duty would now apply to everyone, not just to permit holders.[37]

In the second Senate Judiciary Committee hearing, an officer from the Anchorage Police Employees Association testified in response to the bill. The officer initially testified in support of the bill, stating that "peace officers . . . support the

_____

[34] Audio of House State Affairs Committee, House Bill 102, statement of Representative Eric Croft, Tape 03-39, at 54:02 - 54:45 (Apr. 10, 2003).

[35] Bill File Table of Contents, House Judiciary Committee, House Bill 102 (2003).

[36] Bill File Table of Contents, Senate Judiciary Committee, House Bill 102 (2003).

[37] Audio of Senate Judiciary Committee, House Bill 102, statement of Mark Enoft, staff member to Representative Eric Croft, Tape 03-44, at 2:34 - 3:33 (May 12, 2003).

changes that are being proposed" and generally support any changes that provide "a more detailed instruction about what to do when contacted by peace officers."[38] But when Senator Hollis French asked the officer who would be educating the public about the affirmative duty to inform a police officer about any concealed handgun, the officer responded by pointing out that this was part of the mandatory concealed carry permit training, and he suggested that "some public forum of TV or municipal channels" could also assist in educating the public.[39]

Once the officer realized that the mandatory permit training was being eliminated as part of this legislation, he indicated that he was less in favor of the bill, emphasizing that the police relied on the concealed carry permitting program to know who had a permit and who could legally be carrying a concealed firearm.[40] There was no further discussion of how the public would be educated about the duty to inform a peace officer that they were carrying a concealed weapon if the mandatory concealed carry permit training was eliminated.

The bill was subsequently passed out of committee over Senator French's objection. The bill then became law without any further committee hearings.

---

[38] Audio of Senate Judiciary Committee, House Bill 102, testimony of Officer Mike Couturier, Anchorage Police Employees Association, Tape 03-46, at 48:05 - 48:48 (May 13, 2003).

[39] Audio of Senate Judiciary Committee, House Bill 102, statement of Senator Hollis French, Tape 03-46, at 48:57 - 49:16 (May 13, 2003); Audio of Senate Judiciary Committee, House Bill 102, testimony of Officer Mike Couturier, Anchorage Police Employees Association, Tape 03-46, at 49:19 - 51:15 (May 13, 2003).

[40] Audio of Senate Judiciary Committee, House Bill 102, testimony of Officer Mike Couturier, Anchorage Police Employees Association, Tape 03-46, at 54:30 - 55:56, 57:16 - 57:30 (May 13, 2003).

*Our analysis of AS 11.61.220(a)(1)*

As just discussed, the legislative history of AS 11.61.220(a)(1)(A)(i) contains a memorandum from Legislative Counsel Gerald Luckhaupt in which Luckhaupt opines that the term "contacted by a peace officer" was "designed to reach situations when a concealed handgun permittee is contacted by a peace officer and the peace officer is entitled to do a protective frisk of the person under the authority of *Terry v. Ohio*, 392 U.S. 1 (1968)."[41]

In *Terry v. Ohio*, the United States Supreme Court held that a police officer's authority to make an on-the-street "stop and frisk" is bounded by the protections of the Fourth and Fourteenth Amendments.[42] The Court therefore ruled that a police officer could "seize a person and subject him to a limited search for weapons" only if the police officer had "reasonable suspicion" that "criminal activity may be afoot" and that the person "may be armed and presently dangerous."[43]

Gillis argues that the Luckhaupt memo's reference to the *Terry v. Ohio* "stop and frisk" standard demonstrates that the Alaska legislature intended "contacted by a peace officer" to be limited to circumstances in which a seizure under the Fourth Amendment has occurred. As a general matter, a Fourth Amendment seizure occurs only when an officer "by means of physical force or a show of authority, in some way restrains the liberty of a citizen."[44] "A person is 'seized' within the meaning of the

---

[41]  Memorandum from Gerald P. Luckhaupt, Legislative Counsel, to Representative Eric Croft, regarding House Bill 102, (Apr. 9, 2003).

[42]  *Terry v. Ohio*, 392 U.S. 1, 8, 30-31 (1968).

[43]  *Id.* at 15, 30.

[44]  *Barrows v. State*, 814 P.2d 1376, 1378 (Alaska App. 1991).

Fourth Amendment only if, in light of all the circumstances, a reasonable person would believe that he or she was not free to leave or to break off the questioning."[45]

In response, the State argues that the plain language of the statute suggests that the legislature intended "contacted by a peace officer" to be defined more broadly and to include essentially *any* contact with an officer who is acting in their official capacity.

As already explained, Alaska applies a sliding scale approach to statutory interpretation, in which "the plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be."[46]

Here, the plain language of the statute is susceptible of multiple meanings. Alaska Statute 11.61.220(a)(1)(A)(i) requires a person carrying a concealed weapon to, "when contacted by a peace officer," "immediately inform the peace officer" that they are in possession of a concealed weapon. The phrase "contacted by a peace officer" is defined to mean "stopped, detained, questioned, or addressed in person by the peace officer for an official purpose."[47]

"Stopped" and "detained" are both legal terms used to describe a person who has been temporarily seized for Fourth Amendment purposes. Thus, one possible interpretation of the duty imposed by AS 11.61.220(a)(1)(A)(i) is that it applies only to Fourth Amendment seizures and to no other police-citizen contacts (*i.e.*, the interpretation suggested by the Luckhaupt memo). But in interpreting a statute, we presume that "the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are

---

[45]  *Id.*

[46]  *Muller v. BP Expl. (Alaska) Inc.*, 923 P.2d 783, 788 (Alaska 1996).

[47]  AS 11.61.220(i).

superfluous."[48] If the legislature only intended to cover Fourth Amendment seizures, it is difficult to explain the inclusion of the words "questioned" and "addressed" in addition to "stopped" and "detained." In other words, the plain language suggests the legislature did not necessarily intend to limit "contacted by a peace officer" solely to situations in which a person could be considered "seized" for purposes of the Fourth Amendment.

At the same time, the tools of statutory construction suggest that "questioned" and "addressed" were nevertheless intended to have meanings *similar to* "stopped" or "detained." Under the rule of statutory construction known as *noscitur a sociis* (literally, "it is known by its associates"), "the meaning of a word in a statute can be gleaned from the words associated with it."[49] Thus, while "questioned" or "addressed" could potentially be interpreted broadly to encompass a wide variety of interactions between police and citizens, this canon of statutory interpretation strongly suggests that "questioned" and "addressed" should be interpreted more narrowly to include only the sort of police-citizen interactions that are consonant with the same sort of exercise of formal authority or official investigative action that is characteristic of an investigative stop or seizure.

Interpreting the statutory language in this narrow manner is consistent with language in the statute specifying that the contact must be "for an official purpose."[50] It is also consistent with the use of the word "addressed," which connotes a level of formality not typically present in regular speech.[51]

---

[48] *Johnson v. State*, 380 P.3d 653, 656 (Alaska 2016).

[49] *Dawson v. State*, 264 P.3d 851, 858 (Alaska App. 2011).

[50] AS 11.61.220(i).

[51] *See* Bryan A. Garner, *Garner's Modern English Usage* 21 (5th ed. 2022) (describing "address" as "a FORMAL WORD").

Interpreting the statutory language in this narrow manner is also consistent with the legislative history. As just explained, the 2003 Luckhaupt memo indicates that the language was "designed" to reach situations in which a Fourth Amendment seizure has taken place. However, the 1994 legislative history suggests that the term was also intended to include circumstances that closely resemble Fourth Amendment seizures. In addressing legislative concerns regarding when the duty to inform would apply, Representative Jeannette James provided two examples in which permittees would be expected to inform a peace officer that they had a permit and were carrying a concealed firearm pursuant to that permit. The first example involved a traditional investigative stop; the second example involved a situation where a person witnesses a "skirmish" and then finds themselves involved in an active police investigation, even though they are not the target of the investigation.[52] Thus, the examples noted by Representative James suggest, consistent with our interpretation of the plain language, that AS 11.61.220(a)(1) was intended to apply primarily to Fourth Amendment seizures and to additional police-citizen interactions that closely resemble Fourth Amendment seizures in terms of formality and purpose.

Lastly, we note that the doctrine of constitutional avoidance favors this narrow interpretation of the statute. As a general matter, "[i]f an ambiguous text is susceptible [of] more than one reasonable interpretation, of which only one is constitutional, the doctrine of constitutional avoidance directs us to adopt the interpretation that saves the statute."[53] There are at least two serious constitutional problems with interpreting AS 11.61.220(a)(1) to encompass a broad array of citizen-police interactions.

---

[52] Audio of Senate Finance Committee, House Bill 351, statement of Representative Jeannette James, Tape SFC-94, #78, at 1:13:48 - 1:14:01 (Apr. 29, 1994).

[53] *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019).

In *Ford v. State*, an unpublished decision, we discussed some of the potential constitutional problems posed by an overly broad reading of "contacted by a peace officer."[54] As we noted in *Ford*, a person has an absolute right to walk away and terminate contact with a police officer if they have not been seized.[55] This right to walk away was recognized by the United States Supreme Court in *Florida v. Royer*, and is one of the cornerstones of our liberty rights.[56] If the legal requirement to "immediately inform" an officer of a concealed weapon "when contacted by a peace officer" is defined too broadly, there will be an obvious tension between that legal obligation and a person's general right to terminate an unwanted contact with the police. It is inevitable that informing the police of a concealed weapon will extend the duration of the contact, particularly given the concomitant obligation to "allow the peace officer to secure the deadly weapon."[57] Applying the duty to inform primarily to circumstances where a person has been seized and is no longer free to walk away eliminates some of these underlying constitutional concerns with the statute. It also confirms that "questioned, or addressed in person by the peace officer for an official purpose" should be interpreted narrowly as applying to circumstances where the person is aware that their interaction with the police will be of some duration.

In addition to the constitutional concerns we raised in *Ford,* there are also the constitutional concerns raised by Representative Berkowitz in the 2003 legislative

---

[54]  *Ford v. State*, 2018 WL 3166882, at \*4-5, n.17 (Alaska App. June 27, 2018) (unpublished).

[55]  *Id.* at \*4 & n.15.

[56]  *See Florida v. Royer*, 460 U.S. 491, 497-98 (1983) (holding that when an officer approaches an individual, and identifies himself as a police officer "[t]he person approached [ ] need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way").

[57]  AS 11.61.220(a)(1)(A)(ii).

history.[58] Alaska Statute 11.61.220(a)(1)(A)(i) is unusual because, unlike most criminal statutes, it does not prohibit certain unlawful behavior; instead, it imposes an affirmative obligation to act.[59] And it is the *failure* to act — *i.e.*, the failure to "immediately" inform a peace officer of a concealed weapon upon being contacted by the officer — that is criminalized under the statute.

When a crime is defined in terms of a failure to act, "the prevailing view is that [one] may not be held liable if [one] does not know the facts indicating a duty to act."[60] Moreover, where the failure to act involves conduct that is not otherwise illegal and not inherently viewed by society as wrongful, the State is required to prove that the defendant acted culpably with respect to the inculpating circumstance — they must demonstrate some consciousness of wrongdoing.[61] Here, the conduct at issue —

---

[58] Audio of House State Affairs Standing Committee, House Bill 102, statement of Representative Ethan Berkowitz, Tape 03-38, at 25:13 - 25:45, 28:22 - 28:44 (Apr. 8, 2003).

[59] AS 11.61.220(a)(1)(A)(i).

[60] *Steve v. State*, 875 P.2d 110, 122 (Alaska App. 1994) (citing 1 Wayne R. LaFave, *Substantive Criminal Law* § 3.3(b), at 289-90 (1st ed. 1986)) (alterations in original) (abrogated on other grounds by *Jeter v. State*, 393 P.3d 438 (Alaska App. 2017)); *see also Speidel v. State*, 460 P.2d 77, 78 (Alaska 1969) ("It is said to be a universal rule . . . that conduct cannot be criminal unless it is shown that one charged with criminal conduct had an awareness or consciousness of some wrongdoing."); *Yang v. State*, 107 P.3d 302, 309 (Alaska App. 2005) ("In crimes of omission, the State must prove that the defendant failed to perform the required act, but the State must also prove that the defendant was aware of the circumstance that created their legal duty to act. More specifically, . . . the State must show that the defendant was aware of the circumstance that triggered the duty to act[.]" (internal quotations omitted)).

[61] *See, e.g.*, *Lambert v. California*, 355 U.S. 225, 229-30 (1957) (holding that it is not consistent with due process to convict a person who failed to timely register as a felon if the person did not know of the duty to register and there was no proof of the probability of such knowledge); *Hentzner v. State*, 613 P.2d 821, 826 (Alaska 1980) (holding that consciousness of wrongdoing was an element of the offense of willfully failing to register securities); *Speidel*, 460 P.2d at 80 (holding that the statute punishing failure to return a rented motor vehicle was invalid to the extent that it punished a person who had no awareness of wrongdoing); *Yang*, 107 P.3d at 310 ("[T]he breath test refusal ordinance did

carrying a concealed firearm — is not inherently wrongful; indeed, as a general matter, an individual's right to bear arms is constitutionally protected conduct under the federal and state constitutions.[62]

The constitutional concerns raised by Representative Berkowitz were therefore proper. How is a person to learn of the affirmative duty to "immediately" inform a peace officer of any concealed weapon now that there is no longer a mandatory permitting system educating them on that affirmative duty? And how is a person to know when such a duty is triggered in the absence of the peace officer asking the person if they have any weapons?

In the current case, these due process concerns are lessened because Gillis was advised by a military police officer four months earlier about the general duty to inform a peace officer of any concealed firearms. But this advisement took place in the context of Gillis reporting a crime to the police officer, and the question still remains whether he could reasonably be expected to know that his interaction with the police during the events in this case constituted being "stopped, detained, questioned, or addressed in person by the peace officer for an official purpose" for purposes of triggering his affirmative duty to inform the police of the firearm he was carrying.

---

not prescribe a culpable mental state, [and therefore] we concluded that, at the least, the ordinance required [the government to show] proof of the motorist's negligence — *i.e.*, that the motorist 'knew or reasonably should have known' of their obligation to take the test." (citing *Svedlund v. Anchorage*, 671 P.2d 378, 385-86 (Alaska App. 1983))).

[62] *See* U.S. Const. amend. II; Alaska Const. art. I, § 19; *see also District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (explaining that "the Second Amendment conferred an individual right to keep and bear arms"); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S., 142 S. Ct. 2111, 2122 (2022) (holding that the Second and Fourteenth Amendments "protect an individual's right to carry a handgun for self-defense outside the home."); *Gibson v. State*, 930 P.2d 1300, 1301 (Alaska App. 1997) (explaining that the Alaska Constitution was amended in 1994 to make clear the right to bear arms is an individual right rather than a purely militia right).

As the district court found, Gillis's interaction with the police was extremely casual. It consisted of the police asking Gillis "what's up" and engaging in "chit chat" about what was happening. At no point did the police engage in any show of authority or suggest that Gillis was not free to leave and terminate the encounter. The police did not ask Gillis if he had any weapons, and at no point did the police question Gillis, ask for his name or identification, or otherwise treat him as a witness or participant in the driving under the influence investigation. Indeed, by the time Gillis arrived on the scene, the investigation was essentially over — the driver had been arrested and the car was being impounded.

The plain language and legislative history of the statute indicate that "contacted by a peace officer" was designed to reach Fourth Amendment seizures and other police-citizen encounters that closely resemble Fourth Amendment seizures in terms of formality and investigative purpose. Given that Gillis was never seized, never became a target or a participant in the investigation, and was never asked any questions or even asked his name, we conclude that the evidence presented at trial was insufficient to establish that Gillis was "stopped, detained, questioned, or addressed in person by the peace officer for an official purpose" when he assisted his friends in removing their possessions from a car that was being impounded.

*Conclusion*

The judgment of the district court is REVERSED.